AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)  ☐ Original  ☐ Duplicate Original

**LODGED**
CLERK, U.S. DISTRICT COURT

11/19/2021

CENTRAL DISTRICT OF CALIFORNIA
BY: ___DM___ DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

**FILED**
CLERK, U.S. DISTRICT COURT

11/19/2021

CENTRAL DISTRICT OF CALIFORNIA
BY: ___GR___ DEPUTY

United States of America

v.

MICHALEA LATISE BARKSDALE,

Defendant(s)

Case No. 2:21-mj-05332

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of April 13, 2020, in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1344(2) | Bank Fraud |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_/s/ Francisco Solorio Perez_
*Complainant's signature*

Francisco Solorio Perez, USPIS Postal Inspector
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: ___November 19, 2021___

_Karen L. Stevenson_
*Judge's signature*

City and state: ___Los Angeles, California___

Hon. Karen L. Stevenson, U.S. Magistrate Judge
*Printed name and title*

AUSA: Maria Elena Stiteler (x6148)

**AFFIDAVIT**

I, Francisco Solorio Perez, being duly sworn, declare and state as follows:

**I.    PURPOSE OF AFFIDAVIT**

1.   This affidavit is made in support of a criminal complaint and arrest warrant against MICHALEA LATISE BARKSDALE ("BARKSDALE") for a violation of Title 18, United States Code, 1344(2) (Bank Fraud).

2.   This affidavit is also made in support of applications for warrants to search:

a.   The premises located at 842 East 109th Street, Los Angeles, California 90059 (the "SUBJECT PREMISES") as described more fully in Attachment A-1;

b.   A white 2019 Lexus sedan, bearing the license plate 8USM013 ("SUBJECT VEHICLE 1") as described more fully in Attachment A-2;

c.   A black 2019 Kia four-door sedan with California license plate 8JUB565 ("SUBJECT VEHICLE 2") as described more fully in Attachment A-3; and

d.   The person of MICHALEA LATISE BARKSDALE, as described further in Attachment A-4.

3.   The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 1708 (Mail Theft and Possession of Stolen Mail), 371 (Conspiracy), 1028 (Fraud and Related Activity in Connection with Identification Documents, Authentication Features, and Information), 1028A (Aggravated

1

Identity Theft), 1029 (Access Device Fraud), 1344 (Bank Fraud),
and 1349 (Bank Fraud Conspiracy) (the "Subject Offenses"), as
described more fully in Attachment B.  Attachments A-1, A-2, A-
3, A-4, and B are incorporated herein by reference.

     4.   The facts set forth in this affidavit are based upon
my personal observations; my training and experience; and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested complaint, arrest
warrant, and search warrants, and does not purport to set forth
all of my knowledge of or investigation into this matter.
Unless specifically indicated otherwise, all conversations and
statements described in this affidavit are related in substance
and part only.

## II.  BACKGROUND OF AGENT

     5.   I am a Postal Inspector with the United States Postal
Inspection Service ("USPIS") and have been so employed since
August 2019.  I have completed a fourteen-week basic training
course in Potomac, Maryland, which included training in the
investigation of identity theft via the United States Mail.  I
am currently assigned to the USPIS Los Angeles Division, Mail
Theft team where my responsibilities include the investigation
of crimes against the United States Postal Service ("USPS") and
crimes related to the misuse and attack of the mail system,
including theft of Unites States Mail, fraud, and related
activity in connection with access devices, identity theft, and

2

unauthorized use of other persons' information for financial
gain.

### III. SUMMARY OF PROBABLE CAUSE

6.   In 2020, an internal investigation at the federally
insured Bank of America, N.A. ("Bank of America") revealed that
between 2014 and 2020, a phone number ending in -9197 (the
"-9197 number") was used to access approximately 193 Bank of
America Employment Development Department pre-paid debit cards
("EDD cards") that had fraud claims filed by Bank of America
clients.

7.   Bank of America ATM video surveillance showed that the
numerous fraudulent transactions on the EDD cards were made by
an unknown female driving a Kia bearing California license plate
8BFF952, which was registered to BARKSDALE.   DMV photographs of
BARKSDALE confirmed that BARKSDALE was the unknown female on
video surveillance.   BARKSDALE was also identified as the
subscriber of the -9197 number.

8.   On or about March 5, 2021, I discovered that a phone
number ending in -5110 (the "-5110 number") was also used to
call Bank of America on multiple occasions to inquire about the
different EDD cards.   The -5110 number was later associated with
fraudulent withdrawals from multiple EDD cards, including those
of identity theft victims.   I obtained subscriber information
for the -5110 number from T-Mobile and learned that BARKSDALE
was also the subscriber for this phone number.

9.   In total, BARKSDALE is currently linked through video
surveillance and/or phone access to fraud claims totaling

3

approximately $236,000 in losses.  The -5110 number has been used to call into the Bank of America EDD card phone system as recently as August 20, 2021.

10. Based on a search of records from DMV, I learned BARKSDALE reported the SUBJECT PREMISES as her residence and had at least three vehicles (including SUBJECT VEHICLE 1 and SUBJECT VEHICLE 2) registered to her at the SUBJECT PREMISES.  On or about July 12, 2021, I saw a woman who appeared to be BARKSDALE standing in the driveway of the SUBJECT PREMISES.  On or about October 5, 2021, I learned BARKSDALE was receiving mail at the SUBJECT PREMISES.

11. Bank of America ATM video surveillance shows BARKSDALE driving SUBJECT VEHICLE 1 and SUBJECT VEHICLE 2 while taking part in fraudulent transactions.

## IV.  STATEMENT OF PROBABLE CAUSE

12. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.   EDD Cards Reported Stolen from the Mail**

13. On or about March 5, 2021, I reviewed documents received from a Bank of America Senior Internal Investigator II (the "Investigator") regarding the investigation of missing EDD cards.  These documents showed that:

a.   In 2020, the Internal Enterprise Investigations ("IEI") unit at Bank of America received information from Bank of America's Global Compliance and Operational Risk unit about a

long-term investigation into the apparent theft of EDD cards where clients had filed fraud claims.

  b. IEI reviewed approximately 49 EDD card accounts and video surveillance from Bank of America.  Based on IEI's review, an unknown female (later identified as BARKSDALE) had been observed conducting ATM transactions in the greater Los Angeles area on the EDD cards that were reported lost or stolen by the cardholders.

  c. IEI performed a data analysis of the 49 EDD card accounts and located additional EDD cards that appeared to be part of the same fraudulent scheme.  Specifically, IEI located 256 unique EDD cards that were connected by link analysis based on previous casework from the Bank of America Global Compliance and Operational Risk unit and based on phone numbers calling VISA's Voice Response Unit ("VRU"), which is an automated telephone system used to activate, check balances, and perform other simplistic inquiries on EDD cards.  IEI noticed that for approximately 193 of the linked EDD cards, a common phone number ending in -9197 was used to call into VISA's VRU and activate the card.  As described in more detail below, the -9197 number is associated with BARKSDALE.  IEI noted that along with calls to activate the cards, additional calls from the -9197 number would be made to check the card account balance.

  d. To activate the EDD cards, Visa's VRU required the following criteria:  the full card number, three-digit card security code (CVV on the back of the card), and the last four of the cardholder's social security number.  Once the subject

5

was able to activate the EDD card, they were able to immediately select a Personal Identification Number ("PIN") and begin use of the EDD card immediately.

   e. Bank of America mailed each card via USPS mail, with the envelope containing the physical card along with the full name and address of the card holder for mailing purposes.

   f. IEI located approximately 125 EDD cards associated with claims totaling approximately $215,641.53 in losses from approximately December 2014 to May 2020.

  **B. BARKSDALE Is on ATM Video Using Other Persons'**
    **Accounts**

  14. I understand the following from my review of Bank of America documents and conversations with the Investigator:

   a. IEI reviewed video surveillance dating between December 13, 2014 to May 11, 2020 and observed a common subject individual throughout the entire duration of this timeframe.  In a video from April 13, 2020, IEI saw the unknown female (later identified as BARKSDALE) driving a black Kia bearing California license plate 8BFF952.  IEI checked California registration records for this Kia, and learned that it was registered to BARKSDALE.

  15. I compared video surveillance images of ATM withdrawals from 2020 related to X.M.'s EDD card and DMV photographs of BARKSDALE.  Based on a comparison of these images, BARKSDALE appears to be the person photographed conducting the following transactions using X.M.'s identity:

| Date | Location | Transaction |
|------|----------|-------------|
| 4/13/2020 | 242 Towne Center Dr, Compton, CA | $500.00 |
| 4/13/2020 | 242 Towne Center Dr, Compton, CA | $400.00 |

16.  I reviewed the April 13, 2020 video surveillance of ATM withdrawals related to X.M.'s EDD card and saw BARKSDALE driving a black Kia sedan bearing California license plate 8BFF952.  I checked California DMV records and confirmed that the vehicle was a 2017 Kia registered to BARKSDALE at 842 East 109th Street in Los Angeles, California 90059 (the SUBJECT PREMISES).

17.  On or about June 7, 2021, I spoke with X.M., who stated he was expecting his EDD card in early 2020 but did not receive it.  X.M. stated he called EDD to report the card missing and was told the card was mailed to his address.  On that date, X.M. also told me that he did not authorize BARKSDALE to have possession of his EDD debit card, nor his mail.

18.  I reviewed additional transactions from on or about April 13, 2020, and learned BARKSDALE conducted at least four additional transactions using two other persons' accounts. Based on ATM videos, it appears that BARKSDALE is the person photographed conducting the following transactions using J.A.Q. and V.C.'s identity:

| Date | Location | Identity | Transaction |
|------|----------|----------|-------------|
| 4/13/2020 | 242 Towne Center Dr, Compton, CA | J.A.Q. | $500.00 |
| 4/13/2020 | 242 Towne Center Dr, Compton, CA | J.A.Q. | $500.00 |

| | | | |
|---|---|---|---|
| 4/13/2020 | 1501 Rimpau Ave, Corona, CA | V.C. | $500.00 |
| 4/13/2020 | 1501 Rimpau Ave, Corona, CA | V.C. | $500.00 |

19. I reviewed call records and learned that the -9197 number called Visa's VRU on the following dates regarding the accounts associated with the following identities:

| Date | Identity |
|---|---|
| 4/8/2020 | V.C. |
| 4/9/2020 | V.C. |
| 4/11/2020 | V.C. |
| 4/13/2020 | V.C. and J.A.Q. and X.M. |
| 4/15/2020 | V.C. and J.A.Q. |
| 4/16/2020 | V.C. and J.A.Q. and X.M. |
| 4/17/2020 | V.C. and J.A.Q. and X.M. |
| 4/21/2020 | X.M |

20. I checked law enforcement databases and learned the -9197 number was a Google Voice phone number. I obtained subscriber information for the -9197 number and learned the subscriber name was identified as "[NAME]s Mommy" and the recovery email was "m.barksdale88@yahoo.com." I conducted a public records search and learned that BARKSDALE's son had the name used in the Google Voice subscriber name.[1] I reviewed the customer profile information for the -9197 number obtained from Google and learned the billing information listed BARKSDALE

---

[1] Because BARKSDALE's son is a minor, I have masked the son's name in this affidavit.

under billing information.  I reviewed the subscriber information records provided by Google for the -9197 number and learned the Google voice number was created on or about July 7, 2011, and the payment profile was created on or about June 12, 2014, before any of the fraudulent EDD card transactions linked to the -9197 number.

###    C.    BARKSDALE Activates EDD Cards with a Second Phone Number Ending in -5110

21. I understand the following from my review of documents received from Bank of America and my conversation with the Investigator:

a.    I noticed a common phone number ending in -5110 (the "-5110 number") called VRU on multiple occasions in connection with the fraudulent withdrawals.  The Investigator conducted a secondary search using the -5110 number and obtained additional EDD cards associated with that phone number, including those of identity theft victims P.S., M.C.M., C.M.R. and M.J.S., discussed later.

22. I obtained subscriber information from T-Mobile for the -5110 number and learned that BARKSDALE was named as the subscriber for the -5110 number.  BARKSDALE's SSN and date of birth were also included in the subscriber information.

###    D.    BARKSDALE Is on Additional ATM Videos Using Other Persons' Accounts Associated to the -5110 Number

23. I compared video surveillance images of ATM withdrawals from 2020 and 2021 related to P.S.'s EDD card and DMV photographs of BARKSDALE and, based on those photographs, it

appears that BARKSDALE is the person photographed conducting the following transactions using P.S.'s identity:

| Date | Location | Transaction |
|------|----------|-------------|
| 12/29/2020 | 5531 La Palma Ave, La Palma, CA | $1,000.00 |
| 1/01/2021 | 5531 La Palma Ave, La Palma, CA | $70.00 |

24. I reviewed video surveillance images of ATM withdrawals related to P.S.'s EDD card and saw BARKSDALE driving a white sedan on or about January 1, 2021.

25. On or about September 3, 2021, I spoke with P.S., who stated he did not remember when his EDD card was mailed to him, but remembered it was probably in December 2020. P.S. stated he did not receive his EDD card. P.S. stated he called EDD and Bank of America to report the card missing and was told the card was mailed to his address. P.S. also stated he did not authorize BARKSDALE to have possession of his EDD debit card, nor his mail.

26. I reviewed additional transactions related to the -5110 number and learned that BARKSDALE conducted at least five additional fraudulent transactions using at least three other persons' accounts. Based on my review of ATM surveillance images and BARKSDALE's DMV photograph, it appears that BARKSDALE is the person photographed conducting the following transactions using M.J.S., M.C.M. and C.M.R.'s identity:

| Date | Location | Identity | Transaction |
|------|----------|----------|-------------|
| 2/10/2021 | 570 Hidden Valley Pkwy, Corona, CA | M.C.M. and C.M.R. | Balance Inquiry |
| 3/12/2021 | 1501 Rimpau Ave, Corona, CA | M.J.S. | $1,000.00 |
| 3/16/2021 | 2690 Hamner Ave, Norco, CA | M.J.S. | $1,000.00 |
| 3/20/2021 | 242 Towne Center Dr, Compton, CA | M.J.S. | $1,000.00 |

27.  I reviewed video surveillance of the February 10, 2021 ATM transactions related to M.C.M. and C.M.R.'s EDD card and saw that the person who appeared to be BARKSDALE was driving a white Lexus sedan bearing temporary license plate BJ45B47 (SUBJECT VEHICLE 1).  I checked law enforcement databases and learned SUBJECT VEHICLE 1 is a 2019 Lexus, currently bearing the license plate 8USM013, registered to BARKSDALE and M.C. at 842 East 109th Street in Los Angeles, California 90059 (the SUBJECT PREMISES).

28.  I reviewed video surveillance of ATM transactions related to M.J.S.'s EDD card from on or about March 16, 2021, and saw BARKSDALE driving a black four door sedan bearing California license plate 8JUB565 (SUBJECT VEHICLE 2).  I checked law enforcement databases and learned SUBJECT VEHICLE 2 is a 2019 Kia with California license plate 8JUB565, registered to BARKSDALE at 842 East 109th Street in Los Angeles, California 90059 (the SUBJECT PREMISES).

29.  I reviewed video surveillance of ATM transactions related to M.J.S.'s EDD card from on or about March 20, 2021, and saw BARKSDALE driving a two-door Dodge vehicle bearing California license plate T932H0 (the "Dodge").  I checked law

enforcement databases and learned that the Dodge is a 2018 Dodge
registered to M.C. at 842 East 109th Street in Los Angeles,
California 90059 (the SUBJECT PREMISES).

    30. I reviewed additional call records related to
the -5110 number and learned that on or about May 11, 2021,
the -5110 number, subscribed to BARKSDALE, called the VRU with
respect to B.J.C.'s EDD card.  B.J.C.'s EDD card is associated
with approximately $930 in reported fraudulent losses.  I
reviewed an ATM surveillance image related to a March 23, 2021
ATM transaction from B.J.C.'s EDD card.  Based on my review of
the ATM surveillance image and BARKSDALE's DMV photograph, it
appears that BARKSDALE is the person photographed conducting a
$900 withdrawal on March 23, 2021, using B.J.C.'s identity.

    31. I reviewed additional call records related to
the -5110 number, and learned that the -5110 number has been
used to call into the Bank of America EDD card phone system as
recently as August 20, 2021.

    **E.   Investigation of the SUBJECT PREMISES**

    32. Based on a search of records from the DMV, I learned
that BARKSDALE reported the SUBJECT PREMISES as her residence.
I also learned that BARKSDALE has at least three vehicles
registered to her at the SUBJECT PREMISES, including SUBJECT
VEHICLE 1 and SUBJECT VEHICLE 2.

    33. On or about October 5, 2021, I checked postal
databases and learned BARKSDALE was receiving mail at the
SUBJECT PREMISES.

34. On or about July 12, 2021, I conducted surveillance at
the SUBJECT PREMISES.  While conducting surveillance, at
approximately 11:20 a.m., I saw a woman who appeared to be
BARKSDALE walking in the driveway of the SUBJECT PREMISES.

## V.   TRAINING AND EXPERIENCE REGARDING FRAUD, MAIL AND IDENTITY THEFT CRIMES

35. Based on my training and experience and information
obtained from other law enforcement officers who investigate
mail and identity theft, I know the following:

a.   It is common practice for individuals involved in
identity theft, bank fraud, and access device fraud crimes to
possess and use multiple digital devices at once.  Such digital
devices are often used to facilitate, conduct, and track
fraudulent transactions and identity theft.  Suspects often use
digital devices to perpetrate their crimes due to the relative
anonymity gained by conducting financial transactions
electronically or over the internet.  They often employ digital
devices for the purposes, among others, of: (1) applying online
for fraudulent credit cards; (2) obtaining or storing personal
identification information or "profiles," often for the purpose
of establishing or modifying fraudulent bank accounts and/or
credit card accounts; (3) using fraudulently obtained bank
accounts and/or credit card accounts to make purchases,
sometimes of further personal information; (4) keeping records
of their crimes; (5) researching personal information, such as
social security numbers and dates of birth, for potential

identity theft victims; and (6) verifying the status of stolen access devices.

b.   It is a common practice for those involved in access device fraud or bank fraud to use either false identification or stolen real identification to make purchases with stolen access devices at retail stores in order to avoid detection and to complete the transaction.  Those who engage in such fraud keep evidence of such retail transactions on their person, or in their residence or vehicles.

c.   It is common for identity thieves, and individuals engaged in bank fraud, access device fraud, and identification document fraud to use equipment and software to print credit and identification cards, to create magnetic strips for credit cards, to use embossing machines to create credit cards, to use laser printers to create checks, and to use magnetic card readers to read and re-encode credit cards. Software relevant to such schemes can often be found on digital devices, such as computers.  Such equipment and software are often found on fraudsters' persons, in their residences and vehicles, and on their digital devices.

d.   Oftentimes mail and identity thieves take pictures of items retrieved from stolen mail or mail matter with their cellphones.

e.   Based on my training and experience, I know that individuals who participate in mail theft, identity theft, bank fraud, and access device fraud schemes often have co-conspirators, and often maintain telephone numbers, email

14

addresses, and other contact information and communications involving their co-conspirators in order to conduct their business.  Oftentimes, they do so on their digital devices. Suspects often use their digital devices to communicate with co-conspirators by phone, text, email, and social media, including sending photos.

## VI.  TRAINING AND EXPERIENCE ON DIGITAL DEVICES[2]

36. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are

---

[2] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously

develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

37. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

      a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

      b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

38. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.    Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.    Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress BARKSDALE's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of BARKSDALE's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

39. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. CONCLUSION

40. For all of the reasons described above, there is probable cause to believe that MICHALEA LATISE BARKSDALE has committed violations of Title 18, United States Code, Section 1344. There is also probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 1708 (Mail Theft and Possession of Stolen Mail), 371 (Conspiracy), 1028 (Fraud and Related Activity in Connection with Identification Documents, Authentication Features, and Information), 1028A (Aggravated Identity Theft), 1029 (Access Device Fraud), 1344 (Bank Fraud), and 1349 (Bank Fraud Conspiracy) will be found in the search of the SUBJECT PREMISES, the SUBJECT VEHICLES, and the person of BARKSDALE, as described in Attachment A.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 19th day of November, 2021.

THE HONORABLE KAREN L. STEVENSON
UNITED STATES MAGISTRATE JUDGE